[Cite as *Gough-Northrup v. Hammonds*, 2022-Ohio-4342.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| JULIE A. GOUGH-NORTHRUP, | : | JUDGES: |
| | : | Hon. Earle E. Wise, P.J. |
| Plaintiff - Appellant | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| KIMBERLY S. HAMMONDS, | : | Case No. 2022 CA 00023 |
| | : | |
| Defendant - Appellee | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Licking County
                             Municipal Court, Civil Divison, Case
                             No. 20CVF01911


JUDGMENT:                    Affirmed


DATE OF JUDGMENT:            December 5, 2022


APPEARANCES:

For Plaintiff-Appellant                For Defendant-Appellee

ERIC E. WILLISON                       ROBERT J. KIDD
Nobile & Thompson Co., L.P.A.          Gallagher, Gams, Tallan,
7509 East Main Street Ste. #208        Barnes & Littrell, LLP
Reynoldsburg, Ohio 43068               471 E. Broad Street, 19th Floor
                                       Columbus, Ohio 43215

*Baldwin, J.*

**{¶1}** Plaintiff-appellant Julie A. Gough-Northrup appeals from the March 25, 2022 Judgment Entry of the Licking County Municipal Court Civil Division.

### STATEMENT OF THE FACTS AND CASE

**{¶2}** On September 28, 2020, appellant filed a complaint against appellee Kimberly S. Hammonds seeking compensation for damage to her motor vehicle allegedly caused by appellee's negligent operation of a motor vehicle. Appellant sought to recover damages for the diminished value of her vehicle, which was a 2015 Subaru. Appellee filed an answer to the complaint on December 11, 2020.

**{¶3}** Thereafter, on March 25, 2021, appellant filed a Motion for Summary Judgment on the issues of lability and damages. Appellee filed a memorandum in opposition to the Motion for Summary Judgment on April 20, 2021 and appellant filed a reply on April 21, 2021. Appellee filed a memorandum contra appellant's supplement to her Motion for Summary Judgment on August 24, 2021. Pursuant to a Judgment Entry filed October 1, 2021, the trial court granted the Motion for Summary Judgment as to liability only and scheduled an oral hearing on damages.

**{¶4}** At the oral hearing on damages, Dan Longenette, who was appellant's expert witness, testified that he was a syndicated auto expert who did appraisals on motor vehicles. He testified that he had evaluated the diminished value on appellant's vehicle about two and a half years ago. He testified that he did not see the car prior to its repair but only in its repaired condition. Longenette testified that he observed a caulking mistake located on the rear panel near the hatch/trunk. He further testified that there was a gap issue with where the door meets the rear quarter panel.

{¶5}    Longenette was asked about his valuation of the vehicle. He testified that it was worth a lot less because of the damage. He testified that the retail value of the Subaru was $19,200.00 if the vehicle was never damaged and that it cost $4,553.40 to repair. Longenette testified that it was impossible to restore a vehicle that has been in an accident to its pre-accident state. He opined that the value of the repaired vehicle was $14,900.00 and that in its unrepaired condition, the vehicle would have been worth between seven to eight thousand dollars. The following is an excerpt from his testimony at the hearing:

{¶6}    A:  Yes, Fourteen nine and I think that is a …that was an aggressive number and the reason that I if it would have been a typical big three car like a Chevy, Ford, or Chrysler product I probably wouldn't have been that aggressive but Subaru's (sic) have a I hate the word Cult but the people do like Subaru's (sic) and so that is why I was a little aggressive on numbers.  If that would have been a General Motors product with the same numbers I would have been two thousand less because they just don't have the reputation that Subaru has.

{¶7}    Hearing transcript at 22. Longenette testified that appellant would have suffered a loss of $4,300.00 ($19,200.00 minus $14,900.00).

{¶8}    On cross-examination. Longenette testified that he performed his inspection of the vehicle in April of 2019, which was two and a half years prior to the hearing. He had not seen or further inspected the vehicle since then and did not know if appellant still owned the vehicle.  He further testified that he did not have any contact with the repair shop about the repairs that they performed and had not seen the body shop's photos until that day.   Longenette admitted that when he prepared his report, he had never seen the vehicle in its damaged condition.  He testified that when he determined the initial pre-

accident value of the vehicle, he used a retail value while when he found the value after the accident to be $14,900.00, he used a trade in value. He admitted that the trade in value was less because car dealerships had to make a profit and that the highest potential value was the retail value and the lowest potential value was the trade-in value. Longenette admitted that, in his report, he never actually referenced a value for the vehicle in its damaged condition but that he did when he filed an affidavit for purposes of summary judgment.   In his affidavit, he opined that the vehicle in its damaged condition was at best $8,000.00. Longenette also testified that the epoxy or sealant that was on the hatch could be repaired and that the paint blend issue could also be fixed. The following testimony was adduced when he was asked why he used a retail value for the first value and then a trade-in value for the second value:

**{¶9}**   A:  Because you have to put the gauge on it somehow and for thirty years we always said that if a car has been in a major accident and major is anything over a thousand dollars nowadays that we always go to rough trade value as a or as where we think we could retail the car for because you have to make it affordable for the next buyer to justify putting their loved ones or their self in a car that has been in an accident.

**{¶10}** Hearing transcript at 40. There was testimony that on the Carfax report, there was no indication that the vehicle was involved in an accident.

**{¶11}** On redirect, Longenette testified that there had been unibody damage to the vehicle and that you could not completely repair a unibody frame back to its manufacturer's condition.

**{¶12}** Andrew Tilton, who owns automotive repair businesses, testified as an expert on behalf of appellee.  He testified that he was never able to physically look at the

vehicle but that he viewed photographs of the damage to the vehicle. He testified that he noticed damage to the passenger door and rear quarter and that, to the best of his knowledge, that was the only location of damage. He agreed that the caulking mistake is something that could be repaired if appellant took the vehicle back to the body shop. The following testimony was adduced when Tilton was questioned about the gap the Longenette was referring to:

{¶13} Q:  Do you have an opinions regarding that gap?

{¶14} A:  Well in this picture that has been presented um…it appears that there is a gap.  In the picture that is colored the picture that was taken has a reflection in it and that reflection shows that I don't know who took the picture unless it was Mr. Longenette…

{¶15} MR. NOBILE:  Your Honor, can I interject, I did it just sounds like it is inconsistent with his prior testimony.  Did you say that you did look at colored pictures or you did not look at colored pictures?

{¶16} A: I have looked at colored pictures.

{¶17} MR. NOBILE:  Okay I got the impression when you were up first that you did not look at any colored pictures.

{¶18} THE COURT:  You will certainly have an opportunity to explore that line of questioning…

{¶19} MR. NOBILE:  Yes, okay.

{¶20} THE COURT:  During your cross examination of the witness.

{¶21} MR. NOBILE:  Thank you.

{¶22} THE COURT:  You may continue counsel.

**{¶23}** A:  I have…the picture that has been presented in this book does not show the reason why I believe the door is actually open.  The color picture shows Mr. Longenette's left leg as a normal left leg would picture in the reflection.  His right leg is about three inches wider and if you take a mirror or you take a piece of glass and you stand in front of it and you open part of the glass that is exactly what happens.  So in this particular case the door, the rear door it is my belief that the rear door is not shut.

**{¶24}** Q:  Okay.

**{¶25}** A:  Which would allow this gap to be much more vibrant that it truly is.

**{¶26}** Q:  All right so if that door is open you think there is going to be…well that is a reasonable explanation for the gap?

**{¶27}** A:  Oh yes.

**{¶28}** Hearing transcript at 60-61. Tilton testified that the fit and finish issue could be resolved through additional repairs.

**{¶29}** Tilton was questioned about appellant's claim for diminished value to the vehicle.  When asked why he believed that appellant had not incurred any sort of diminished value as a result of the accident, he testified as follows:

**{¶30}** A:  Today's (sic) automotive collision repair done correctly really is so good with respect to measurement and lasers and paint that the regular eye in an arm's length sale most likely would never see that this car was in an accident and in diminished value claims this is not about trading it into a dealership, that is not what it is about, this is about a sale between two individuals that are not, you know, being coerced into purchasing the car one way or the other and so when you talk about diminished value we have to land on a value of the car one second before and one second after and then after the repairs

are concluded.  Because this case was never in the position where it was going to be traded into a dealership the eight thousand dollar number that Mr. Longenette came up with is awkwardly low in a hand shake sale.  So how I look at the conclusion that I came to and I think it is fourteen thousand five hundred dollars and that is post-accident pre-repair because I believe that the compliment of the repair facilities given the certifications and the accreditations that they have to have to even work on cars today can appropriately fix that car to its pre-accident condition without well in this particular case they replaced skin, they replaced a door, there is no obvious impact at the rear of the car, there is (sic) no wrinkles in the roof, there is nothing of this car that would let me believe in the slightest that there is structural damage.  So replacing the skin on the car, painting it appropriately, cleaning the overspray off in the last picture if it were in color you could see that, fixing the wheel opening molding that is not affixed correctly over the drive's side rear wheel opening.  That was the picture that Mr. Longenette couldn't explain what it was.  These are all things that are completely doable and completely done at or with precision and done that way and even this case can be still done that way. There would be no reason for this car to lose any of its value whatsoever.

{¶31}  Hearing transcript at 66-67.

{¶32}  On cross-examination, Tilton testified that he never looked at the vehicle in 2018 when the accident occurred, but was basing his opinions on photographs. He testified that there was scuff damage to the rear bumper, but that the bumper did not need to be replaced. According to Tilton, the scuffs could be corrected. Tilton disagreed with Longenette' s opinion that there was structural damage to the vehicle and testified that the "car is completely back together with gaps that are standard within reason of the

industry." Trial Hearing transcript at 75. He testified that the damage appeared to be cosmetic. Tilton agreed that the value of the vehicle before the accident was $19,200.00. He testified that the value after the accident but before the repairs was $14,500.00.

{¶33} The trial court, pursuant to a Judgment Entry filed on March 25, 2022, found that there was no diminution in value because the value after repairs was equal to the pre-accident value of the vehicle. The trial court awarded appellant damages in the amount of $1,000.00 which represented her deductible. The trial court, in its decision, found that "the deceptive method of calculating the RDV (reduced diminished value) by the plaintiff's expert strains his credibility sufficient to preclude the planitff (sic) from meeting her burden."

{¶34} Appellant now appeals, raising the following assignments of error on appeal:

{¶35} "I. THE TRIAL COURT ERRED WHEN [IT] CONFUSED THE APPELLANT'S AND THE APPELLEE'S EXPERTS."

{¶36} "II. THE TRIAL COURT ERRED WHEN IT FOUND THAT APPELLANT DID NOT PRESENT SUFFICIENT PROOF TO MEET THE PREPONDERANCE OF THE EVIDENCE BURDEN TO ESTABLISH HER DAMAGES."

I, II

{¶37} Appellant, in her first assignment of error, argues that the trial court erred when it confused her expert and appellee's expert. In her second assignment of error, she contends that the trial court erred in finding that she did not show by a preponderance of the evidence that she was entitled to the relief requested.

**{¶38}** The trial court, in the case sub judice, indicated that it found appellee's expert to be more believable than appellant's expert. The trial court, in its decision, stated that appellant's expert had indicated that he had never seen the vehicle in person and had only seen photographs of it the morning of the trial.

**{¶39}** Appellant is correct that the trial court confused the two experts. Appellant's expert testified that he had physically inspected the vehicle and had taken photographs of the same. In his affidavit which was submitted as an exhibit, he stated that he had inspected the vehicle on or about April 29, 2019. In turn, appellee's expert, in his affidavit that was admitted as an exhibit, stated that he had reviewed the repair estimates, photographs and Longenette's report. He had not physically viewed the vehicle. However, for the following reasons, we find such error harmless.

**{¶40}** Appellant, in this case, sought damages based on the residual diminution of value of the car. Generally, the owner of a damaged motor vehicle may recover the difference between its market value immediately before and immediately after the collision. *Falter v. Toledo*, 169 Ohio St. 238, 158 N.E.2d 893 (1959), paragraph one of the of the syllabus; *Williams v. Sharon Woods Collision Ctr., Inc.*, 2018-Ohio-2733, 117 N.E.3d 57, ¶ 9 (1st Dist.); *Rakich v. Anthem Blue Cross & Blue Shield*, 172 Ohio App.3d 523, 2007-Ohio-3739, 875 N.E.2d 993, ¶ 9 (10th Dist.). The owner of a vehicle may prove and recover the reasonable costs of repairs provided that the recovery may not exceed the difference immediately before and after the collision. *Falter* at paragraph two of the syllabus; *Sharon Woods Collision Ctr.* at ¶ 9. Thus, when proving damages to a vehicle with evidence of cost of repairs, the plaintiff is ordinarily also required to present evidence of the market value of the vehicle before and after the accident so that the court may

ensure that the cost of repairs does not exceed the difference in market value. *Falter* at 240, 158 N.E.2d 893; *Rakich* at ¶ 11. The difference between the market value of a vehicle immediately before the accident and the market value of the vehicle immediately after its repair is referred to as "residual diminution in value." *Id.* at ¶ 14, 875 N.E.2d 993. This Court has held that if the repaired vehicle does not have the same market value as the vehicle before repair, the owner may receive additional damages to compensate her for the residual diminution in value.

{¶41} The trial court, in its decision, found that appellant's expert had used a deceptive method of calculating the residual diminution in value. The trial court noted that her expert had used a retail price to set the pre-accident value of the vehicle, but had used the trade-in price to set the post-repair value.

{¶42} "Fair market value" otherwise known as "retail value" is defined as that price which would be agreed upon between a willing seller and a willing buyer in a voluntary sale on the *open market. Wray v. Stvartak*, 121 Ohio App.3d 462, 471, 700 N.E.2d 347 (1997); *Masheter v. Ohio Holding Co*, 38 Ohio App.2d 49, 54, 313 N.E.2d 413 (1973). As noted by the court *in Welsh v. Yoshida,* 9th Dist. No. 2001-L-033, 2002-Ohio-1954, "'trade-in value' has a similar market to wholesale value in that it represents the amount a seller may receive from a retailer who is attempting to make a sale to the seller."

{¶43} As noted by the trial court, appellant's expert did not testify as to what the "actual value for both retail versus trade-in would be for the vehicle in question both pre- and post-accident." The only testimony as to the value of the vehicle both before and after the accident came from appellee's expert who testified that there was no diminution in

value. We find, therefore, that the trial court did not err in finding that appellant had failed to show by a preponderance of the evidence that she was entitled to the relief requested.

{¶44} Appellant's two assignments of error are, therefore, overruled.

{¶45} Accordingly, the judgment of the Licking County Municipal Court Civil Division is affirmed.

By: Baldwin, J.

Wise, Earle, P.J. and

Gwin, J. concur.